The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye! Hear ye! Hear ye! All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning ladies and gentlemen. Our first case for argument today is Whole Woman's Health Alliance v. Rokita. Mr. Fisher. Thank you, Judge Easterbrook, and may it please the Court. After three and a half years of litigation, this global assault on Indiana's abortion code has withered to just a few claims, many barred by controlling precedents as the Court's stay order confirms. Beyond that, plaintiffs have disclaimed proof that Indiana's abortion laws prevent any women from having any abortions, yet their cost and convenience undue burden theory has been and their First Amendment theory contravenes both the law and the evidence. Now given the stay order, I thought I would focus first on the informed consent disclosures and then proceed to the other laws yet to be considered. Mr. Fisher, before you turn to that, one thing that is certainly weighing on my mind is whether this Court ought to just hold back given that Dobbs is before the Supreme Court. We will, of course, one way or the other, be obliged to follow whatever Dobbs does. And so I had the feeling, preparing for today, of kind of an interesting intellectual exercise, but what are we really doing here? Thank you, Your Honor. I think we've been discussing the same thing internally, as you might imagine. And I don't think Dobbs will make the landscape of the law any worse for the state of Indiana here. I think, you know, if anything, it will get better. We think we have a solid case on the doctrine as it is. It's certainly possible that Dobbs will rewrite the doctrine in a way that we can't foresee. One thing I think that is unlikely is that it will change the landscape with respect to the informed consent provisions. That has to do, I think, with a somewhat different doctrine that's not probably going to be implicated by whatever Dobbs does to the 14th Amendment due process inquiry. That said- Why are you confident that it won't affect all provisions? One of the important questions, which was flagged by this court's, well, I hate to cite that it's Planned Parenthood against Box. We have quite a few Planned Parenthood against Box cases. But the one that's at 991 Fed Third said that under Casey, there is a general cost-benefit analysis, which the judiciary would carry out despite the Chief Justice's view of that. And at least I think that was important to the district court in this case, because the district court said that the costs and benefits have changed over time, and therefore the constitutional outcome could change. We may well learn from Dobbs whether the view in Planned Parenthood against Box is correct. So far as I can see, that has been pending in the Supreme Court with no action taken since a conference last June, which suggests that the justices are holding that case for Dobbs and implies that we should hold this case for Dobbs. Look, I don't think- we're not asking for any kind of expedition, for sure. I don't think it's, you know, a bad idea necessarily to not decide it before Dobbs. But I guess on the informed consent piece, I'm less convinced that Dobbs is likely to change anything. But let me just say, I mean maybe people are reading this lengthy opinion from the district court judge a bit differently, but if Dobbs, for example, were to endorse the position that the chief justice took in the June medical case and said, look, this is really just all about substantial obstacles, it's not about cost-benefit weighing, just supposing, then it seems to me that parties, of course, would express their views to us about what the proper disposition should be. But at a minimum, you might need to send it back to the district court to consider the legal standard or the new legal standard as announced by the Supreme Court, that that happens with some regularity when the Supreme Court takes an action. And so, it's hard to see what we are going to say that would supersede or somehow anticipate what the Supreme Court is doing. We certainly aren't going to supersede it, I mean, blamely. Well, I do think the court took the right course on the stay motion, though, in saying that the precedents that cover, that uphold the regulations that we have that are directly challenged here have not been overruled by the court, and this court can't overrule those. And I think that that continues to carry the day, and really it comes down to just the couple of regulations here that don't have precedents on point and what you're going to do with those. But to my knowledge, the stay matter was resolved last summer as it was resolved, and I didn't understand today's argument to be just a matter of revisiting that. I understood back when it was scheduled before Dobbs was on the docket before all sorts of other things happened, it was to reach the merits, and that's my concern. I understand the state, and I can understand why you might think this, believes that whatever the court is going to do isn't going to make you worse off. There are plenty of things that I could imagine our discussing if we were in some stable legal world where I didn't think the standards were going to change. I think they're very interesting findings of fact. I think the court believes that many of these things are issues of fact, and the record in many other cases that this court cited. But again, that all strikes me as a rather academic in the pejorative sense of that term, a rather academic discussion. I understood. I, you know, the court's view, and I completely agree, the stay motion was, you know, not, and today wasn't just to revisit that. My only point there is that the court recognized that it's bound by those precedents that do exist on point, and that continues to be the case. Well, yes. Well, I mean, of course, as you know, there was not a unanimous view about what those precedents said, but it is what it is. I mean, I'm not revisiting that today either. I mean, that seems to me entirely inappropriate. If I might add, I mean, we're talking about, on the other remaining issues where the undue So, yes, I mean, I can certainly understand that the court would not want to devote a lot of resources to those issues. In the meantime, I think, you know, we're principally concerned with where things stand with the stay in place, and then with the informed consent piece. So, and I'll just say, this is a slight merits comment. The nice thing about DOBS, whatever you may think about the law regarding abortions, is that it's very up front. Indiana has argued here that it's protecting women's health in various ways, and yet, you know, it's not insisting on medication abortions in the first 10 weeks. It's insisting on a doctor there, and yet, Indiana doesn't insist on a doctor for child birth. Indiana allows a midwife to go to somebody's home. So, there's no facility requirement, and there's no physician requirement. So, I take from that that Indiana cares much more about the health of women when they're having abortions than the health of women when they're having babies. Well, I think Indiana cares about the health of all women, and it's concerned. But it doesn't insist on a physician to accompany child birth. Well, but I think that the, you know, legislature is entitled to be concerned about, you know, a particular circumstance or a particular outcome that may obtain if it's not going, if it doesn't regulate in a particular area. But here's where, if Indiana were just saying, look, we have a public policy. Our public policy is to discourage abortion in every way that we legally can do. We would all understand that. I mean, it's a very controversial topic. Indiana surely does have its public policy on that. To say that you need health-related provisions for a procedure that's significantly safer than something that you don't use those health provisions for is, strikes one, is disingenuous, frankly. You know, Indiana is just trying to discourage abortions, just as Mississippi is, just as many states are. And the Supreme Court's going to tell us how far a state can go in that direction, right? Well, I'm sorry that you might think we're disingenuous. I don't think we are. I think that, you know, all of our laws that we are defending are sincerely there for the purpose of protecting the health of women. Now- I just don't, I can't see how you can say that with a straight face. I mean, I'm sure you have to as a matter of law, and I'm not criticizing you in that sense. But they're so anomalous that it's hard to see them that way. Okay. Well, you know, this is, I don't know of any insincerity behind it, behind these laws. And that my, you know, not just my view, but my understanding, my sort of interactions with those who care about these issues, these are sincerely there to protect women. Okay. Yeah. Well, I suppose, I, you know, I'm not sure where that leaves us after that discussion. You know, I, again, I think that the informed consent piece probably has some independent doctrinal, you know, I guess, significance apart from the undue burden test that, you know, in whatever Dobbs may signify. So, you know, I'll just continue on with talking about fetal pain. And we can talk about what the district court said there. The Indiana informed consent provision says that the woman must be told that objective scientific evidence shows that a fetus can feel pain at or before 20 weeks of post-fertilization age. Do you see this as a question of law or a question of fact? I see it as principally as a question of law with a perhaps secondary clear error-like question of fact. I think the question of law- The district court simply didn't credit the testimony, your 12 points that you set out in the brief. And it seems to me there, at best, there would be studies on both sides. And that strikes me as more of a question of fact. I don't know. Do you think a worm can feel pain? Um, well, I don't know that. I don't know enough about what, you know, constitutes a, uh, the worm's sensory system to be able to answer that. Well, I do think if you, if you, if you, if you put an electrical stimulus on the worm, it will pull back. So it will respond. Is that pain? The evidence of what that we put forth, the district court did not reject. The district court said this is an accurate statement. I just don't like the way it's framed. She said, well, I'm, I'm, I'm concerned that some people might, might conclude that there is, uh, you know, it's, there's a consensus view, uh, from this state. That's, it was the sort of misleading component of the legal test. Now, you know, the statement itself is objectively true. We, we, she did not reject the evidence we put forth. She acknowledged that there was evidence to support the statement. She just said that this is improperly framed. She said, if it said some scientific research suggests that a fetus can feel pain, that she would have been comfortable with that. Well, it's very difficult. I think it's a legal matter to distinguish between that and the statement as it already exists. And indeed the only evidence that the plaintiffs put into the record is conclusory statements from ACOG and ARCOG. And the leading, uh, neurobiologist from ARCOG has flipped sides on the issue, Derbyshire, which is covered in the, in the ADF brief, which we mentioned. So even if we were trying to think about this as gosh, maybe there's evidence on both sides from this record, from what the plaintiffs put forth, there isn't. The only evidence is what we put forth. And so even if there is a clear error standard in play here, I think it's clearly met. There is no evidence that contradicts the statement that, that the woman has to be told. Well, so that's, you know, that's our, our view on the, on the fetal pain issue, human physical life. Again, I don't see the district court here rejecting the truthfulness of the human physical life statement. Only, um, her sense that it was, uh, somehow a, uh, a statement about the kind of moral quality of, of the human physical life that exists. And the word physical is in the statement precisely to, uh, focus the, the hearer's attention on the idea that this is about biology. This is about science. And indeed the. Does the state follow up with that, with the notion that human physical life can never deliberately be terminated? Um, no, I don't think we say that. I'm trying to think of the statement. I think the, I think the statements, the state's disclosures certainly acknowledge that the state policy prefers childbirth over abortion, but I don't think that. But I'm, I'm worried about things like ectopic pregnancies, which by the state's definition would involve the end of, of a human physical life, even though we know that they're terribly dangerous for, for the mother. Oh, well, yes, but that doesn't, I think, negate the point. I mean, human physical life. And this is, I think where, where Dr. Kerlin's, you know, said that he wasn't contradicted on this score that there was consensus. That's when like human physical life begins at fertilization. Now, you know, whether one draws a conclusion about the moral status of that life from that information. No, I'm, I'm actually on a more mundane level about the law. You know, does, does the, does Indiana prohibit the taking of human physical life as defined by Indiana? Well, I'm not sure what we certainly, we we prohibit murder if that's what you're after. I don't know what you're talking about with respect to, I think with the ectopics, you're talking there about a different set of concerns. You have, I think, maternal fetal issues that have to be sorted through. It's not, you know, the fetus isn't the only human physical life that's at issue. So I think that there's a different set of considerations now that doesn't negate the point that there is a human physical life. And I think it's Dr. Kerlin's acknowledge and see, I think you made the excellent point. Good ethics begin with good facts. And you have to start from that, that fact, that fact of human physical life. Now, you know, what a person that hears that information does with it, how they, you know, address that information in combination with other information could be a different subject, but that's the starting point that the state wants to make clear. And, you know, again, it's worth noting that the rounds case in the eighth circuit held our way and, and to, to conclude the other direction would obviously create a, a circuit conflict. So again, we don't think that there really is, you know, any misleading nature of what the statement says, and it's not contradicted by the record. It's merely a question of, of what the district court judge thought was an implication and not even a false implication, just an implication that, you know, she thought was unwarranted. I think now, you know, those are my, that, those are my main points I want to make on the informed consent piece. I think, you know, with respect to the others on the, on the undue burden, you know, our view, even notwithstanding what the Dobbs case may say right now, our view is that the idea of a substantial obstacle is still a predicate to the balancing. I'm not assuming there's agreement on, on that universally. And you don't think money or distance can ever be a substantial obstacle, I take it. Yeah, I think that the, that what Casey tells us is that things like cost and inconvenience are not substantial. But how do you reconcile that with Hellerstedt? Well, I think Hellerstedt and indeed Schimel, both cases, were dealing there with the obvious shutdown of clinics that was going to prevent abortions. And I don't think the courts had to turn a blind eye to those real world practical implications. But Hellerstedt did also say, you know, that the longer waiting times would actually push people over the 10-week threshold or perhaps even the 14 or 15-week threshold would actually take away their ability to choose this procedure. And fewer doctors, longer waiting times, the court writes, and this was an opinion of the court. It wasn't a plurality opinion, such as in June Medical. So, I mean, I understand it's a viewpoint that, you know, you could charge $100,000 per abortion. And I take it the state of Indiana would say that's not a significant obstacle because it's just money. Well, you know, there are many market forces, I think, that enter into those kinds of issues. And the problem is trying to disaggregate all of those forces. What market forces? I mean, are you just saying that somebody could come to Illinois? No, no. I'm saying that there are many reasons that clinics do or do not offer services in Indiana at whatever price. There's a lot of different factors that go into that. And you can't attribute all of those to the state of Indiana. The question is whether the law in place is posing a substantial obstacle. And really, the only way that I think we know that, if that's happening, is by looking at abortion rates. And the plaintiffs disclaimed an abortion rates case. And Casey tells us that there's, you know, you can't just depend on cost and travel distance and inconvenience. Well, but that's not, to be fair to the district court, that's not what the district court found either. There's quite a bit more than just, oh, it's a little bit longer to go here. The district court makes findings about the burdens of trying to comply with this law and its effect on abortion availability. No, look, I think the district court said, look, it's going to cost, for example, on the physician only, it's going to cost about $50, maybe $55 more. And there's going to be a few more appointment slots available without any finding that those appointment slots would actually be filled or without any evidence suggesting that without those appointments. I think there was a finding that the slots would be filled, actually, just as an empirical question. I don't read the record that way. I certainly think to the extent that we're talking about women shifting, you know, from one time slot to another, you know, that might happen, but it doesn't mean that all of the time slots would be filled. It just means that they would be available. And the idea was it would be more convenient to have more time slots. And that's not, I think, under Casey, sufficient for a substantial obstacle. See, I'm getting into my rebuttal time and I'd like to reserve the remainder if I could, please. Thank you. Certainly, Mr. Fisher. Ms. Sharma. Ms. Sharma, you are muted. Thank you, Your Honor. May it please the court. Rupali Sharma for Applebee's Whole Woman's Health Alliance, All Options Pregnancy Resource Center, and Dr. Jeffrey Glaser. The district court in this case held that several Indiana laws are depriving Indiana residents of their constitutional rights each day after hearing testimony from two dozen live witnesses, carefully weighing their credibility and other evidence and issuing detailed findings of fact and conclusions of law. But Ms. Sharma, let me pose the same question to you that I started with Mr. Fisher. The district court, no doubt, heard a lot of evidence and wrote a very long opinion. But if the legal framework changes in a material way, such as by making it very clear that the Chief Justice's view of the way substantial obstacle factors into this analysis is the correct one. Let's just suppose they say that. What work is there for this court to do? Surely, at that point, we would have to send this back to the district court for application of the now defined by the Supreme Court correct legal standard. I understand, Your Honor. I think there are two points to consider. One is that, as my friend on the other side conceded, we don't know what the Supreme Court is going to do. What we do know is that— which is really not that far away. Right. But the issue, Your Honor, is that people do have a right to abortion now, and we do have guidance on how to ensure that that right is vindicated. And the district court found that people's rights are being violated every day. This isn't a pre-enforcement challenge. So as we sit here, if the district court's factual findings were correct and survived the clear error standard, which they assuredly do, those people are being deprived of their rights. And so even if the jurisprudence changes, you know, months from now, those people will have been irreparably harmed. But is that the right way to think about this? I mean, when the Supreme Court rules on this, in their role as the last word in our system, they're going to be saying, this is, you know, the correct legal framework for this particular kind of thing. This is what the due process clause means. Whatever other part of the Constitution they want to bring into it, they'll bring in. And, you know, if we have stayed, as we have done, the effect of the district court's injunction, and it turns out that the injunction was not correctly entered because of whatever the court says about the legal framework, maybe under the new framework, there would be the possibility of some other injunction, maybe, as Mr. Fisher's arguing, for parts of it but not other parts of the law. I mean, it's highly speculative. And it's not that I mind working hard at all, but I feel that our role in this system is to, you know, respect what the court is doing. It does seem to have cases on hold for Dobbs. And I just don't think, I don't know, I'm very concerned about whether it's a wise use of our time to do anything but put this case on hold and invite statements from the parties after Dobbs is handed down about the appropriate way forward. Counsel, Your Honor, respectfully, I do believe that this court has an obligation to apply existing law. And I do believe that existing law provides patients in Indiana a right to abortion and that the district court's judgment finds substantial support in the record. So I would entirely agree with you if Dobbs were not on the docket. I mean, if we were just in a world where lots of people were writing law review articles saying, oh, I bet the Supreme Court's going to reconsider Roe versus Wade soon or something, that cuts no, nothing with me. You know, we would apply the existing law as we did with the stay motion, as we have done with other cases that have come up, not just from Indiana but from any place in our jurisdiction. But that's not the world we're in. The world where we're on the precipice of hearing from the Supreme Court. Your Honor, I understand that. I think, again, the issue is that we're dealing with a fundamental right here. And so for people who are supposed to be able to enjoy that right but are unable to do so, what happens today or in the next few weeks or months is critical. And, again, I would direct the Court back to the record in this case, which, you know, supports the District Court's judgment in the case. I would also add specifically on the docket issue— Excuse me. While you're on the topic of the record, one question that did weave its way through Mr. Fisher's presentation is whether the findings of the District Court in this case, this opinion, can be justified only by the weighing of benefits versus burdens that you see in Hellersted or whether the findings of fact, before the District Court gets to the conclusions of law, some or all could also be sustained on the substantial obstacle approach that the Chief Justice advocated for in his concurring opinion in June Medical. Yeah, Your Honor, I do believe that the District Court's judgment should be affirmed regardless of which of those standards is applied. And I think the reason is that currently, yes, the Court should look at first whether a law is reasonably related to a legitimate interest and then consider the burdens. But even if it were to start with the burdens and consider substantial obstacles first, here there is ample evidence that these laws prevent certain people from getting abortions in Indiana and otherwise heavily burden them. And so I— Mr. Fisher argues that you didn't point to a single abortion that somebody was trying to get that they couldn't. Can you respond to that? Absolutely, Your Honor. I would point the Court to Ms. Miller. She was the Area Services Director of Planned Parenthood. Her testimony testified that she's—that Planned Parenthood entities in Indiana routinely see people who contact them during their first appointment and they haven't reached the gestational age cutoff for getting an abortion in Indiana. But because of the delays imposed by some of the laws at issue, including the physician-only laws, when they try to get their abortion, they've missed that mark and they have to travel out of state. There's also ample evidence in the record, of course, supporting that the second trimester hospitalization requirement forces people out of state. And I would remind the Court that in Schimmel, for instance, this Court held that forcing residents out of the state is tantamount to preventing them from getting an abortion, period, because you can't understand a harm to a constitutional right by virtue of how it is able to be exercised in another jurisdiction. So I think on both of those points, my friend on the other side is incorrect. I did want to walk through each of the laws at issue, including the laws that are state. I would also just add on the Dobbs issue, if this Court were to incline to hold the case pending Dobbs, we would ask the Court to lift the state that's in place for the reasons that I mentioned, because people's rights are actively being violated. So that the laws that the district court found were unconstitutional would no longer pose substantial obstacles to abortion access for those patients. But turning to the physician-only law, the evidence shows in the district court found that the law is not reasonably related to any legitimate state interest in health or safety. The district court credited the testimony of Dr. Grossman and didn't just rely on his experience, training, and working with APCs, but noted that that experience found substantial support in medical literature, in research. And you'll see this approach replicated as to every law, not just the physician-only law. So the district court looked at what major medical associations do, and they endorsed the provision of care by ASCs. As I recall, the non-physician providers are, for example, capable of prescribing mifepristone, whatever, the two drugs, and misoprostol for miscarriage management. They just can't prescribe these drugs to induce an abortion. Is that correct? That is correct. It's the very same medication permitted in the context of miscarriage, disallowed in the context of abortion. And there is evidence in the record showing that the complications and the way that you manage the complications does not differ from the context of miscarriage to abortion. And Indiana licenses them to read ultrasounds, so they are already licensed to detect ectopic pregnancies. They are, Your Honor. And there is evidence in the record that APCs at Women's Med in Indianapolis already do this. So again, that wouldn't be a barrier to them providing abortion care. In addition to meeting that first prong of the undue burden standard, again, the record evidence is clear that the physician-only law, as with the other laws at issue, heavily burdened patients' access to abortion. Well, it was enjoined only with respect to the pills, right? The state, the district court upheld quite a few provisions of the Indiana law, including physician-only for surgical procedures, invasive procedures. That's correct. We're only talking about medication abortion. And the burdens would apply to restricting the provision of medication abortion to physicians. And, you know, far from simply making it less convenient for patients, what the record shows is that the inability of abortion facilities to hire APCs to provide that care when they are capable of doing so means that patients face substantial delays to access. Does the record reflect anything about the job market? I mean, Mr. Fisher made the interesting point that the availability of abortion in Indiana is not exclusively a function of what the state has said. There are only so many physicians who are willing to perform that service. There may be only so many APCs. And so what I'm wondering is whether the situation you're dealing with is simply a result of market forces or if it's, in fact, something that we have to put at the foot of the state. I have two responses to that, Your Honor. First, there is record evidence showing why abortion facilities have a difficult time hiring additional abortion providers when physicians are the only ones permitted to provide even medication abortion. That's often because abortion is stigmatized in Indiana and across the country. And what facilities have found is that people who are interested in providing nonetheless face the danger of protests and other harassment, not only at abortion clinics, but other facilities. So is that the fault of the state of Indiana? Or is that just a reflection of public opinion? Or are you talking about heckler's vetoes? Where does that fit in analytically? It fits in analytically in the sense that both the precedence of this court and the Supreme Court requires courts to consider the context in which laws operate in figuring out how they burden patients. In Planned Parenthood v. Adams, for instance, in which this court considered the impact of a parental notification provision, it didn't just stop at the direct impact of that provision. In figuring out how that law would impact minors, it looked at the challenges minors already faced, not just challenges that were directly attributable to the state, but challenges they faced as minors. Things like how would they explain their absence from school if they needed to get a procedure, that sort of thing. And so I think that's critical here, that in evaluating burdens, you look at context. Not only Planned Parenthood v. Adams, but the Hellerstedt case, June Medical, all of them have looked at the law in the environment it's operating in. I think something else that's instructive on that point is the interplay between the and June Medical. Those cases involved an identical restriction. We were talking about an admitting privileges requirement. It was exactly the same. But in June Medical, the court didn't say, look, we've already decided this law. It looked at how that law functioned in that state. It looked at that population. It looked at that population's struggles. And so I think context is paramount here in assessing the burden of any law. I'd like to move on to the second trimester hospitalization requirement. Like the physician-only law, the state has not provided evidence that the law actually furthers health or safety, and conversely, it does impose heavy burdens on patients. But how do you respond, though, to the discussion of that law in the order staying the district judge's decision? Yes, Your Honor. So the second trimester hospitalization requirement, there is actually Supreme Court precedent supporting an affirmation of the district court's judgment here. I would point the court to the city of Akron case. In that case, because of the evolution in the safety and efficacy of second trimester abortion care, because of the advent of D&E procedures, the court found that a hospitalization requirement, again, did not actually further any health or safety interest. Even at that time in 1983, major medical associations had abandoned the recommendation that such procedures be performed in hospital settings. So I actually feel that existing law supports affirmation of the district court's judgment on that count. It is actually interesting to ask how the Supreme Court is required to follow developments of that sort in the medical profession. Because I would say simply, as a person who listens to the news, in this past couple of years of the pandemic, the medical profession has swept toward telemedicine to the point where they won't even see you if you're not willing to be on the other side of a TV screen or a computer monitor. And the trend has been, over many, many years, away from hospitalization and toward outpatient care. That's correct, Your Honor. But the Supreme Court says, well, the Constitution doesn't flip every time the medical profession comes up with a different idea. No, it doesn't. But I think what the city of Akron cases and other cases support is that when a state does decide to legislate in an area, when it does decide to regulate medical care, and particularly medical care that's protected as a fundamental right, it can't deprive patients of scientific progress. It can't exclude them from those benefits. In Indiana— I mean, I'm very sympathetic to this, but where does it say that? I mean, what authority is there for that? If the state wants you to go and have leeches attached to your arm, can it say, we've actually discovered that leeches were underestimated, and so that's the care we're going back to? Yes, two responses to that, Your Honor. First is the city of Akron case. The fact that the court looked at what the medical advances were and the fact that the law had departed from that standard of care in finding that the restriction was not reasonably related to a legitimate interest. And then I would also point you to the undue burden standard yourself. The point of that first prong is to ensure that, again, legitimate interests are actually being furthered. And so if the state has asserted an interest in health and safety, it has to show that these restrictions are actually providing that benefit. The leeches example, Your Honor, would not obviously satisfy that test, and so I think that's further proof of the fact that there has to be not just an assertion of legitimate state interest, but evidence that those interests are being furthered. So are you arguing then for, on the benefit side of things, a pretext analysis? I mean, the state offers all sorts of things that it says are benefits. I guess if everybody had a personal physician, that would be even better on a concierge basis. But when we look at what the state is asserting, do we need to go so far as to see if there's evidence in the record that the asserted benefit is simply pretextual? I think this court is obligated to determine whether an illegitimate interest is actually being furthered. That said, I do think pretext plays a role in this case, as it did in Schimel, because there are two instances in which pretext can be apparent. One is when there is such an utter failure to actually advance the asserted interest, as in this case. Another instance, and I think Your Honor mentioned this earlier, is when there is regulation of conduct, but then not regulation of conduct of equivalent or greater risk. And that's what we see, for instance, with the distinction between allowing APCs to provide the same set of medications for miscarriage care, but not abortion care. I do think those two instances apply here and point to pretext, but I don't think this court needs to find pretext to affirm the district court's judgment. It simply needs to apply that first prong of the undue burden standard to see if interests are being furthered. And then obviously, if there are burdens on the other side of the ledger, do those burdens substantially outweigh either the failure to further any interest at all or de minimis advancement of those interests? I would like to briefly mention the restrictions that pertain to the telemedicine ban, including the in-person exam requirement. Indiana has broadly authorized the use of telemedicine in other contexts and excluded abortion patients from that benefit, even during the pandemic. And again, the problem with that is that the record evidence shows that providing medication abortion via telemedicine, including providing the pre-abortion counseling that needs to proceed that provision of care, it does not differ in any material respects when it's done through the sort of video conference technology that practitioners would use to provide that care. And again, there is several studies that support that. One study from, I believe, Iowa involved 20,000 patients, and it compared patients who used telemedicine to patients who didn't. And it found not only that complications were low across the board, but that they didn't differ from context to context. And so again, given that Indiana has chosen to legislate in that area, it can't deprive abortion patients of that option. And the record evidence does show that affirming the district court's judgment and allowing providers to provide medication abortion via telemedicine would have a dramatic effect on the availability of care. There is record evidence showing that facilities currently are only able to offer abortion services one or two days a week or one or two days every other week. Allowing telemedicine would change that to four to five times a week. So again, patients would not have to contend with the sort of delays that I had mentioned earlier. And I will add, the parties have stipulated to the fact that delays mean an increased medical risk. And so increased medical risk associated both with abortion, but also with just being pregnant. And so if the state's interest is in health or safety, they're not only not advancing it, they're actually detracting from that. So again, I mean, in terms of precision of the evidence, do we have a sense of how often these delays push somebody beyond the 10 weeks that's the outer limit for the medication process? We do. Again, I would point you to both, to Ms. Miller's testimony, the representative for Planned Parenthood. She not only testified that Planned Parenthood routinely sees people who are cut off from getting an abortion in Indiana, but that the delays mean that when they first contact the clinic, they would be eligible for a medication abortion, at least gestational age wise. And then because of the delay, they're no longer able to enjoy that option and have to either get an aspiration abortion or maybe even push beyond that. Ms. Hagstrom-Miller also offered testimony to that effect, that the clinic routinely has to refer people away from their clinic because they missed that 10 week mark and aren't able to get a medication abortion. So certainly delay has a profound effect on care. I did want to also touch on the facilities regulations. Thank you, the district court found, do not advance health or safety. My friend on the other side mentioned the housekeeping room requirement. And while that may seem like a minor requirement, I think the problem is that it has a very big effect on patients' access to care. Planned Parenthood of Evansville cannot comply with that requirement. And as a result, people in that area have to travel to the Bloomington facility to get abortion care. That's a 250 mile trip. And I take the court's point that travel and costs are not always substantial obstacles. But in this case, the district court found that the majority of patients seeking abortion care in Indiana are low income women. And what that means is that for them, even $40 constitutes, can make the difference between getting health care or not getting health care. These people routinely forego health care so they can pay their rent and utilities. And I do think this is another way in which the record evidence in this case differed dramatically from the record evidence in Casey. In Casey, the group that was most burdened by things like cost and delayed did not necessarily bear the same features that the district court found are present in the population that's being most burdened by the laws here. And so, too, with the aspiration abortion regulations, on the one hand, they do not for their health or safety. But on the other hand, they're preventing clinics that provide medication abortion care from providing aspiration abortion care. I see my time has expired. I would just ask this court to affirm the district court's judgment and prevent the ongoing harm to patients' constitutional rights. Thank you, Ms. Sharma. Anything further, Mr. Fisher? Your Honor, really just one point I want to mention. Ms. Sharma brought up the issue about the Evansville Clinic. And I think it's important to stress that the Evansville or the Evansville Health Facility of Planned Parenthood is not a party in this case. And our view is that there is no standing by any of the plaintiffs to challenge the room closet housekeeping requirements because of that. Now, to the extent that Planned Parenthood might want to open that facility as a clinic, they could, of course, petition for a waiver from the Department of Health. Or they could just file their own lawsuit attacking it. I think, really, if we think about the facility's requirements more generally, part of the kind of wonderment about the case is, why are we fighting over hallway widths and 10 feet in a procedure room? When those are obviously well known, nobody disagreed that you have to have some kind of minimum size of hallways and procedure rooms. It's just a question of what size is it going to be. And to the extent that Holman's Health falls short, it, too, could ask for a waiver from the Department of Health. And then if that's not forthcoming, there could be an as-applied challenge. And so I think part of the point here is that what remains to be decided that's not covered by existing precedent are really issues that ought to be dealt with at most in an as-applied context. And I think the court could, with respect to what's covered in the state order, there could be a reversal on those and even a reversal on the other two, acknowledging that the as-applied challenges could come in a different context. And then the court could address the informed consent pieces. That said, we certainly understand that the court is looking at DOPS and trying to figure out why it's worthwhile to act right now. And I think our main concern is keeping the stay in place and having the court address the informed consent pieces. So that's all I have. And so for those reasons, we ask the court to reverse the decision below, as indicated in the briefing. Thank you, counsel. The case is taken under advisement.